IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO.: B-14-876 |
| | § | |
| KEVIN LYNDEL MASSEY AND | § | |
| JOHN FREDERICK FOERSTER | § | |

**MEMORANDUM OPINION AND ORDER**

Kevin Lyndel Massey (hereinafter "Massey") and John Frederick Foerster (hereinafter "Foerster"), the co-defendants in this case, were allegedly members of a private volunteer group referred to as "Rusty's Regulators" or "Rusty's Rangers." Whether members of an organized group or not, these individuals and others joined together for the purpose of patrolling the Texas-Mexico border, with the goal of discouraging illegal immigration. Massey is not from Cameron County and stayed temporarily at a local hotel during the time he was in Brownsville patrolling the Rio Grande River.

The facts as they unfolded on August 29, 2014, represent a true miracle in that no one was badly hurt or killed. Some time in the afternoon, the United States Border Patrol ("Border Patrol") cameras detected illegal immigrant activity in the area of Sabal Palm Sanctuary. The Sanctuary is one of the last stands of Sabal palm trees combined with what is in effect a wildlife preserve. It is located south of Brownsville on the banks of the Rio Grande River. While the actual Sanctuary is considered private property, the area where it is located contains both privately-owned property and publicly-owned property in an irregular pattern. Consequently, it is often difficult, even for those familiar with the area, to know whether one is on private or public property. For purposes of Massey's pending motion, the Government has conceded that

should the Court find that any pertinent act in this area occurred on private property, the Court may assume that Massey had the owner's permission and was not trespassing.

Having been alerted to the possibility of illegal activity, Border Patrol dispatched a number of agents to the scene. Once they arrived on the scene (which can be described as fields, brush, or otherwise undeveloped land), the agents, acting in one-man teams, approached the area of the alert from different directions. Included in the group of officers were Senior Agent Danny Cantu ("Cantu") (who testified at the hearing before this Court) and Agent Marcos Gonzales ("Gonzalez") (who did not testify). The agents' approach seemed to work because the illegal immigrants, who by that time were split into two groups, turned back in what proved to be a successful attempt to return to Mexico in order to avoid apprehension. As other agents closed in on the area from the north, Gonzales worked his way in from the west, and Cantu approached from the east.

As Cantu approached from the east, he encountered on a narrow lane an individual named Varner (armed with a Winchester rifle), who is also apparently a member of Rusty's Rangers. As stated above, these "Rangers" are civilians who have voluntarily decided to patrol the Rio Grande River in hopes of deterring illegal immigration. The Border Patrol had previously been apprised that these individuals were patrolling the border, but they possessed no information on their presence at the Sanctuary that day, and the agents had never previously seen these individuals on that property. Upon his encounter, Cantu informed Varner that Border Patrol had agents in the area, and Varner responded that he had two fellow "Rangers" in the area as well. Cantu was in the process of asking Varner (and his friends) to leave while the agents conducted their operation, when suddenly shots rang out from the west. After hearing the gunfire, Cantu radioed to his fellow agents that they were to keep radio silence until the situation

had been assessed. Varner then explained that his friends were in the vicinity where the shots were fired.

Varner and Cantu walked in the direction of the gunshots until they encountered the defendant, Massey, who was standing next to an All-Terrain Vehicle ("ATV") that the Rangers were using in the brush. Massey was wearing fatigues and carrying a weapon that resembled an AK-47 (later allegedly identified as a Centurion Model 39 Sporter). Cantu then asked Varner and Massey to remain by the ATV while he scouted ahead to find the source of gunfire and to make sure his agents were safe.

As he approached the scene of the shooting, Cantu first encountered Foerster, the co-defendant, who was holding a weapon in his hand, but had it dangling at his side. He then saw Agent Gonzales approach. Gonzalez apprised Cantu that he was the one who fired the shots and that he had shot at Foerster, but had, fortunately, missed him. (During this time period, the illegal immigrants returned to the river at a location close to where the shooting occurred and eventually crossed back into Mexico. None were injured or harmed in any way.) Foerster, understandably upset at being fired upon, was looking to confront Gonzales with his fists. Sensing that the situation was fraught with danger, Cantu took control of the scene. He first had Foerster unload and then hand over his weapon―which Foerster did without protest or complaint. Cantu next accounted for all of the other agents and made sure no one was hurt or otherwise in need of medical attention. He detailed two agents to secure the actual shooting scene and then, accompanied by Foerster and Gonzales, Cantu walked back up the road to where Massey and Varner were waiting by the parked ATV.

At this point, as no one was hurt and none of the civilians had fired shots, Massey suggested that he, Varner, and Foerster would like to leave. Cantu, because shots had been fired

by a federal officer, asked them to remain so that an investigation could be completed. At that time, it was unclear whether the scene of the shooting was on private property and would therefore be under the jurisdiction of the Cameron County Sheriff's Office (hereinafter "CCSO"), or on public property, which would be under federal jurisdiction. That being the case, Cantu summoned both state and federal authorities. He then had all of the relevant players move to a designated location closer to the main road where the investigators could easily reach them, and away from the river where they might contaminate the shooting scene. While it is clear that no one was placed under formal arrest, it is also clear that Cantu required that everyone remain there until they spoke to the investigators.

Cantu moved his vehicle and the civilians moved their ATV to a more accessible position, which Cantu described at the hearing as a "staging area." Upon establishing this position, Cantu, still worried about a possible confrontation between Gonzales and the civilians, asked Foerster, Varner, and Massey to turn over their weapons so that he could lock them up in his vehicle while they awaited the arrival of law enforcement officers. At the time, all of the weapons (except Foerster's, which Cantu had kept) were loaded. Varner told Cantu that he and Massey also had pistols (which were not visible to Cantu) in their belts in addition to their long guns (which were visible). They willingly placed all of the rifles and pistols in Cantu's truck at his request. Cantu testified that both of the defendants and Varner were at all times cooperative with him and the members of law enforcement. As they waited, Cantu collected their ID's and, in the case of Foerster who had no ID, identification information.

The first investigator to arrive on the scene was Sergeant Valerio, a deputy sheriff of the CCSO (hereinafter the "Deputy"). Eventually, representatives of Homeland Security and the FBI also arrived at the scene. At one time, there was even a United States Fish and Wildlife

agent present, who had a GPS device enabling the officers to determine that the shooting took place on private property. The shooting occurred at about 3:45 p.m. The Deputy arrived at the staging area at approximately 4:19 p.m. The various law enforcement agents and the civilians remained at the staging area until about 7:00 p.m. while everything was being sorted out. No one was arrested that day. At all times, the defendants were free to walk around. Ice water was given to everyone—Border Patrol, law enforcement, and civilians alike.

The weapons were turned over to the CCSO when the Deputy arrived, as were the ID's of the civilians. The Deputy had his office run a criminal background check and warrant search based upon the ID's. He was thereafter alerted to the fact that Massey and Foerster were convicted felons. The Deputy additionally ran a check to see if the weapons had been reported as stolen. They had not been. Based upon the felony convictions, the CCSO decided to keep possession of Massey's and Foerster's weapons. No one was arrested at that time, however.

Months later, Massey was arrested pursuant to a federal arrest warrant outside the hotel where he was staying. At the time of his arrest, he was carrying a loaded pistol. The agents also obtained a search warrant for his hotel room, where they discovered another weapon. At some point, it was determined that the weapon Foerster carried at the scene of the shooting was also owned by Massey.

Massey was charged with four counts of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Each count in the Indictment relates to each of the firearms attributable to him: (Count One) a Springfield 45 caliber pistol that Massey was carrying on August 29, 2014; (Count Two) the Centurion Model 39 rifle carried when he was first spotted by Agent Cantu; (Count Three) the HS Produkt Model XDS 45 caliber pistol found on Massey's person when he was arrested on October 1, 2014; and (Count Four) an HS Produkt

Model Tactical XD 45 caliber pistol, which was found pursuant to the search warrant executed on Massey's hotel room. While he allegedly owned the gun that Foerster possessed on August 29, 2014, Massey has not been charged in connection with that weapon. Foerster was charged with possessing that weapon in Count Five of the Indictment, to which he has pleaded guilty. Massey's previous felony convictions were both for burglary of a habitation (Cause Nos. F85-92081 and F88-77912). Both convictions were out of Dallas County, Texas, where he was given two five-year sentences to run concurrently on March 1, 1988.

Now before the Court is Massey's "Motion to Suppress Illegally Seized Evidence and Illegally Obtained Statements," [Doc. No. 63], and a Supplement to that motion, [Doc. No. 85]. With regard to the weapon Massey was carrying on the day he was arrested and the one found during a search of his hotel room, Massey has no direct complaint. Obviously, both were discovered pursuant to lawfully-executed warrants. Instead, Massey seeks exclusion of these two weapons as "fruit of the poisonous tree" based upon his claim that the first two weapons (those discovered on August 29, 2014) were illegally seized. Massey argues that without this "illegal" seizure, the warrants would have never been issued and the other two weapons would not have been found. Therefore, this Court will focus on the events of August 29, 2014, and will not pursue a detailed analysis of the weapons obtained in October when Massey was arrested.

As described above, Agent Cantu first encountered Massey as he responded to gunfire in an area where he knew that other agents were in pursuit of illegal aliens. According to Cantu, he immediately noticed that Massey was in possession of the Centurion Model 39 Sporter 7.62 X39 mm rifle, which is the weapon forming the basis for Count Two of the Indictment. It was not concealed in any manner whatsoever, nor could it be as it is a rifle much like an AK-47. Cantu then proceeded to the shooting site, separated Gonzales and Foerster, and had all of the witnesses

retreat to an area some distance away to await the arrival of investigators. Given that Foerster was still upset at being the target of Gonzalez's shots and that he had threatened violence, Cantu, for officer (and civilian) safety purposes, secured the weapons visible to him—the pistol that Foerster had been carrying and the two long guns carried by Varner and Massey. At that point, Varner volunteered that he and Massey were also carrying concealed pistols both of which the men voluntarily relinquished possession. All of the weapons were placed in Cantu's truck while the men waited for the CCSO to arrive.

At the staging area, when Cantu took control of the long arms possessed by Varner and Massey (both of which he had already seen them carrying on the road by the river), the weapons were sitting in an open ATV and clearly visible. No search was involved. The handguns were discovered, not because of a search, but as a result of Varner volunteering (to his credit) that he and Massey were carrying them. Cantu might have discovered the pistols if he had performed a pat-down, but at this point, it probably did not seem necessary as neither Varner nor Massey seemed violent or uncooperative, nor were they suspected of any wrongdoing. Cantu's action in securing all of the weapons in his truck was clearly justified in light of Foerster's continued animosity. Having a loaded gun in the vicinity of an angry man who had just been fired upon when the perpetrator was also in the vicinity would have been negligent and downright dangerous.

The only other act in which Cantu took an active role was trying to establish the identities of Varner, Massey, and Foerster. When the Deputy arrived on the scene, Cantu turned over to him the guns, the ID's, and the investigation, and stood back. The guns were kept by the CCSO once it was established that Foerster and Massey had criminal records that might be the basis of an illegal weapon possession charge.

Massey's only persuasive argument is that Cantu asked or ordered him (and Varner and Foerster) not to leave the area until the investigators had an opportunity to speak with them about the shooting.  The first point to be stressed is that they were not the target of this investigation, as they were not the ones who opened fire.  Rather, it was an investigation of the federal officer who had discharged a weapon, Agent Gonzalez.  Once the CCSO arrived on the scene, Cantu turned over the guns and ID's to Deputy Valerio.  Other than that, Agent Cantu and the other individuals sat around, drank cold water provided to them by law enforcement, and waited for the investigation to be completed.

Deputy Valerio radioed the information concerning the identification of the civilians and the serial numbers of the guns.  The response he received from the CCSO revealed that there were no outstanding warrants for the civilians and the guns had not been stolen; nevertheless, the Deputy's investigation brought to light the prior felony convictions for Foerster and Massey.  Sergeant Valerio was in charge of the scene from the time he arrived at 4:19 p.m.  He stated that all of the civilians had been free to leave until the point of time when it became clear that the defendants might have been committing a crime in plain sight of law enforcement as potential felons in possession of firearms.  At that point, he said that he would have asked them to stay while that issue was resolved.  There is no evidence that this thought was ever communicated to anyone or that the defendants were ever asked to stay by anyone other than the initial request by Cantu.  The Deputy contacted officers at CCSO headquarters who responded that he needed to keep the guns.

Massey was not arrested at the scene because the sheriff's department had not completed its investigation.  His ID was returned to him and the only other activity in which he participated was an interview by the FBI.  The FBI had been called to the scene because of the discharge of a

weapon by a federal officer, for which protocol requires an investigation. FBI Agent David Cordova spoke to Massey to determine what he knew about the Border Patrol Agent who fired the gun. Cordova was worried about either an assault on a federal agent or an assault by a federal agent. The questions asked of Massey concerned the shooting. Cordova considered it a non-custodial interview and testified that Massey was free to leave at any point in time. The entire interview took place on the side of the road in the staging area that Agent Cantu had designated. Massey's conduct was never the focus of the interview nor was there any focus on the fact that Massey had been carrying a firearm. According to what this Court was told, the only statement made by Massey that was the least bit inculpatory was that he was the owner of the weapon that Foerster was carrying at the time of the shooting. (Massey has not been charged in connection with this weapon.) Massey left the scene at approximately 6:50 p.m. or 7:00 p.m. and was not charged or arrested for the present charges against him for several months.

Massey's Motion to Suppress and Supplement cover both evidence and statements, yet they are quite non-specific. Presumably, his Motion covers all four guns underlying each of the four counts levied against Massey. The Motion wants all statements made on August 29, 2014, and any other statements made to the Government to also be suppressed. No specific statements were identified by the defendant as being harmful or the target of the motion, nor were any ever introduced into evidence. The Court will first address the weapons issue.

With regard to the AK-47-type of rifle (Centurion Model 39 Sporter, 7.62 x 39 mm rifle, serial number 39NC02585) (Count Two of the Indictment), there is absolutely no basis for suppressing this evidence. When Agent Cantu responded to the gunshots, he saw Massey with the rifle in plain view. The rifle was never hidden nor was there ever any search or seizure made in violation of the Fourth Amendment. Agent Cantu later asked for possession of the gun for

officer safety reasons while all involved parties waited for the appropriate law enforcement agencies to arrive to investigate the shooting. This was both legal and reasonable. Foerster was still seething after having almost been the victim of a shooting. Gonzales, the shooter, was also awaiting the investigators. An easily accessible weapon could have proved to be a disaster. Agent Cantu would have been negligent or even grossly negligent if he had not disarmed those involved while the investigation proceeded.

The Court will assume for purposes of this motion that Cantu "ordered," as opposed to "requested," that Massey (and the others) remain at the scene until they talked with investigators. This has no bearing on the rifle Massey was carrying. The fact that the rifle was transported to the staging area by Massey in the open-air ATV does not change anything. The rifle was always open and obvious, and was only secured for the safety of all involved while the situation was resolved and the participants cooled down. The rifle was only seized by the CCSO when it was determined that it was Massey's gun and that he was a convicted felon. Again, this action was both reasonable and legal.

Because this Court finds all actions taken with regard to the rifle to be both reasonable and legal, there is no question that the pistols discovered two months later upon Massey's arrest are not subject to suppression. In October of 2014, while in possession of a federally-issued arrest warrant, officers stopped Massey outside of his hotel room. He was lawfully arrested pursuant to that warrant and, during his arrest, officers found a pistol on his person. A search warrant was obtained for his hotel room, where officers found another .45 caliber pistol. These two guns are the subjects of Counts Three and Four of the Indictment. Thus, the Court finds wholly unpersuasive any argument for suppressing the three guns covered by Counts Two, Three, and Four.

The remaining issues pertain to the pistol that is the subject of Count One. The facts, which are not currently disputed, establish that once the group retreated to the staging area to await the investigators, Cantu sought to secure the weapons while tempers cooled. At the time he asked for the rifles carried by Varner and Massey, Varner volunteered that both he and Massey also had pistols. These pistols had not been visible to Agent Cantu because they were carried in the waistbands of Varner and Massey, where they were covered by their shirts. Varner asked Cantu whether he wanted to secure their pistols in addition to their long guns, to which Cantu answered in the affirmative. The pistols were then given voluntarily and actually placed in Cantu's vehicle by Varner and Massey.

Count One presents a more interesting legal question. This pistol was voluntarily identified and surrendered, but only after Agent Cantu had insisted that the men could not leave the location until the investigators arrived. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would not have believed he was 'free to leave.'" *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Under the circumstances here, a reasonable person would not believe he was free to leave. Despite the fact that no one was patted down, placed in handcuffs, or otherwise restrained, Cantu made it clear that Varner, Massey, and Foerster should wait for the investigators to arrive. Thus, this Court finds, much like a stop at an immigration check-point, that Massey was in "custody" for purposes of the Fourth Amendment.

The Court also finds this "stop" akin to an investigatory stop. Cantu knew a shooting had occurred and also knew that the only witnesses other than the shooter and himself were Varner, Massey, and Foerster, with Foerster obviously being the most important as the sole eye witness. Cantu's actions were reasonable and rational. He secured the scene of the shooting using other

agents. Since he could not ascertain at the scene whether he was on federal property, he called for both state and federal investigators. He then had all the pertinent individuals move away from the shooting scene (so it would not be disturbed) to a place more accessible to the investigators. The shooting took place at 3:45 p.m. Cantu secured the scene, removed the witnesses, and secured the weapons by 4:19 p.m. when the CCSO arrived. This time period was certainly reasonable.

The Supreme Court has rejected a bright line rule for investigatory stops, holding instead that "common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). A court should weigh whether the police diligently pursued the means of investigation and whether the police acted appropriately in a swiftly developing situation. *Id.* Here, as already described in detail, Agent Cantu acted appropriately and defused a situation that could have quickly and easily escalated out of control without someone exercising common sense.

The Supreme Court has always allowed police to check for weapons during a stop for their own safety and for the safety of those in the vicinity. *United States v. Sanders*, 994 F.2d 200, 203 (1993). Therefore, this Court concludes that the investigative stop was reasonable in both time and scope. Further, it was reasonable for Cantu to secure everyone's weapons while the situation was being sorted out. That being the case, this Court denies the Motion to Suppress with regard to the pistols that Varner and Massey possessed at the scene. Cantu did not search for them nor did he seize them. Varner volunteered their existence and location to Cantu and both men placed the weapons in Cantu's truck. Thus, even if one concludes that Varner, Foerster, and Massey were subjects of an investigative, Fourth Amendment stop—neither the stop nor the securing of the weapons was unreasonable, unlawful, or unconstitutional.

The Motion, as it applies to any statements made by Massey, is not as clear-cut. It is indisputable that no law enforcement agent read Massey his *Miranda* rights. At the time, he was considered a witness at most. He was certainly not suspected of a crime by Cantu, who merely detained Massey for investigative purposes. Courts have traditionally distinguished between Fourth Amendment seizures and "custody" for *Miranda* purposes. While they can be co-equal situations, they are not always. A person is "seized" for Fourth Amendment purposes if a reasonable person believed that he or she was not free to leave. For *Miranda* purposes, the restraint necessary to require *Miranda* warnings is that which is associated with a formal arrest. *United States v. Bengivenga*, 845 F.2d 593, 598 (5th Cir. 1988). Clearly, the latter situation did not exist during the time when Agent Cantu was merely maintaining and securing the scene as everyone awaited the arrival of the appropriate authorities. Once Deputy Valerio arrived and took control, he ran checks on the identifications of the men and the guns. He determined based upon the results (and on his conversation with Cantu as to what he observed) that Massey and Foerster were felons who more than likely should not have had guns while they patrolled the banks of the Rio Grande River. This occurred at about 4:25 p.m. The Deputy had arrived on the scene just minutes earlier. While he would have allowed the men to leave at the time he arrived, Deputy Valerio testified that once he knew that Massey was a felon and had a gun, he would not have allowed him to leave. This occurred at about 4:30 p.m.

There is no evidence whether the Deputy ever communicated to anyone his thought that he would not allow Massey and Foerster to leave the area. Regardless, additional investigators arrived and eventually Massey was interviewed by the FBI at 6:00 p.m.–6:15 p.m. The evidence is clear that at no time either before or after the FBI interview were any of the men in handcuffs, in the back of a vehicle, or otherwise restrained in their person. No one suggested that they were

under arrest. No one was restrained in any fashion at the scene. Apparently, everyone (civilians, Border Patrol, and law enforcement agents) involved milled around the staging area while the facts were being gathered. The FBI–Massey interview lasted approximately 25 minutes. Agent David Cordova, the FBI agent who interviewed Massey, said Massey was never in custody and that he was always free to leave. Afterwards, everyone left the scene on their own, including Massey and Foerster. Cordova said Massey left about ten minutes before he did and that he left between 7:00 p.m. and 7:10 p.m.

Thus, the Motion to Suppress the statements turns on whether Massey's interview with Cordova was custodial or non-custodial. This case is certainly unique in its facts. The men were told to remain on the scene until they talked to investigators. They spoke with the investigators and then left on their own accord. The Deputy, who took over the scene from Agent Cantu, thought they were free to leave before he found out about their criminal records, but then, based upon that information, (internally) changed his mind. There is no evidence to suggest that he communicated either thought to Massey or Foerster, or to any other law enforcement agent at the scene or that he acted upon this thought in any fashion. What is more, the Deputy testified that, he had no idea when they left the scene. The FBI, who did the only interview at issue, never thought the men were in custody and never thought of them as anything but witnesses to a possible assault by a federal officer. They made no attempt to detain them other than requiring their presence to be interviewed. It is quite clear that the situation at the staging area was both relaxed and fluid with substantial downtime while investigators from various law enforcement agencies came and went.

The Fifth Circuit has instructed that the degree of the restraint necessary to trigger compliance with *Miranda* is "that degree associated with formal arrest." *Bengivenga*, 845 F.2d

at 598.  The Supreme Court has set out various criteria by which to judge a situation such as this.  The first step to determine if one is in *Miranda* custody is to ascertain how a suspect would have gauged his freedom of movement given all of the objective circumstances.  *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012).  Courts consider:  the location of the questioning and its duration, statements made during the interview, the presence or absence of physical restraints, and the release (or non-release) at the end of the questioning.  *Id.*  Not all restraints on movement amount to custody for *Miranda* purposes; instead the Supreme Court has asked courts to "focus on whether the environment presents the same inherently coercive pressures such as those that would exist during a station house questioning."  *Maryland v. Shatzer*, 559 U.S. 98, 130 S. Ct. 1213, 1224 (2010).  A temporary and non-threatening investigatory stop does not constitute *Miranda* custody.

    The situation at hand is clear.  The authorities were investigating the shots fired by Agent Gonzales and the possibility that he had committed an assault.  Massey was not a target of any investigation and certainly was not the subject of custodial detention.  He was considered a witness.  Once he spoke to the investigators, he was free to leave and he did.  His movements around the staging area were not restricted.  He was not placed in handcuffs or restrained in any fashion.  In fact, as noted above, he was not even frisked.  Had Varner not volunteered the fact that he and Massey were carrying pistols, chances are that no one would have found these weapons.

    There are factors that weigh in favor of Massey's Motion as one balances the applicable criteria.  The time it took investigators to arrive on the scene and the fact that Detective Valerio suspected that Massey and Foerster might be felons in possession of weapons are two factors that weigh in favor of granting the Motion.  The first factor with regard to time is reasonably

explained by the confusion over the ownership of the land that was the scene of the shooting. Since no one was sure if it was privately-owned property (falling under the jurisdiction of local authorities) or federal property (falling under the jurisdiction of federal authorities), Cantu called both levels of law enforcement and it took time for both to arrive. The second factor affecting the time is the remoteness of the location. While this site is not far from the center of the City of Brownsville in terms of mileage, it would take some time for an officer to get out to the location and find the staging area. Consequently, while the time expended was certainly longer than one sees in a normal investigative stop, it is not unreasonable given the circumstances.

The second argument that weights in Massey's favor is the Deputy's suspicion that they might have been committing a crime by carrying firearms. This suspicion arose at about 4:30 p.m. While this fact would normally weigh in favor of a finding of a custodial situation, there is no evidence that he communicated his suspicion to anyone. There is also no evidence that he in any way detained Massey, Foerster, or Varner. In fact, the testimony shows that he returned Massey's ID and that he was not even aware of when they left the scene.

All remaining factors do not support a finding of a custodial situation requiring compliance with *Miranda*. Massey was certainly not interviewed as if it was a "station house" interrogation. Both Agent Cordova and Massey knew the topic at issue was the conduct of the Border Patrol Agent who had fired his weapon. The location was at the roadside out in the country, southeast of the central part of Brownsville. The duration of the interview was less than 30 minutes. There were never any physical restraints used. At the end of the interview, everyone (agents and witnesses) all went their own way. In conclusion, this Court finds that the interview of Massey performed by FBI Agent Cordova was not a custodial interview and did not trigger the need for *Miranda* warnings.

The Motion to Suppress, for the reasons set out herein, is therefore denied in its entirety.

The Court feels compelled to add that while it is denying the Motion to Suppress, it is not ruling that any of the statements made by Massey to Agent Cordova are necessarily admissible or that they are relevant to the charges that have been brought against Massey.

Signed this 5th day of June, 2015.

_____
Andrew S. Hanen
United States District Judge